**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------X
BRENDON NELSON, individually,
BENEDICT WONG, individually,          Civil Docket No.:1:21-cv-777 (JMF)
ALAA KHOURY, individually,
NICHOLAS BOGAN, individually,
STEFFON DUNLOP, individually,
and on behalf of all others
similarly situated,

                Plaintiffs,

   -against-

                                   **CLASS ACTION**
                                   **COMPLAINT**
ROBINHOOD FINANCIAL LLC,
ROBINHOOD SECURITIES, LLC,
ROBINHOOD MARKETS, INC.,

              Defendants.      **Plaintiff Demands a**
                                   **Trial by Jury**

--------------------------------------------------------X

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs BRENDON NELSON, individually, BENEDICT WONG, individually, ALAA

KHOURY, individually, NICHOLAS BOGAN, individually, STEFFON DUNLOP, individually

(hereinafter referred to as "Plaintiffs"), on behalf of themselves and all others similarly situated,

brings this action against Defendant ROBINHOOD FINANCIAL LLC, ROBINHOOD

SECURITIES, LLC, and ROBINHOOD MARKETS, INC., (hereinafter referred to as

"Defendants" or "Robinhood") and alleges as follows:

## PARTIES

1. At all times material, Plaintiff BRENDON NELSON was and is a citizen of the

Commonwealth of Massachusetts.

2.  At all times material, Plaintiff BENEDICT WONG was and is a citizen of the State of New York.

3.  At all times material, Plaintiff ALAA KHOURY was and is a citizen of the State of New York.

4.  At all times material, Plaintiff NICHOLAS BOGAN was and is a citizen of the State of New York.

5.  At all times material, Plaintiff STEFFON DUNLOP was and is a citizen of the State of New York.

6.  Defendant Robinhood Financial LLC is a Delaware limited liability company with its principal place of business at 85 Willow Road, Menlo Park, California 94025. It is a **wholly-owned subsidiary** of Robinhood Markets, Inc; meaning, Robinhood Financial LLC is owned completely by Robinhood Markets, Inc..[1] Robinhood Financial LLC is registered as a broker-dealer with the U.S. Securities & Exchange Commission ("SEC"). Defendant Robinhood Financial LLC acts as an introducing broker and has a clearing arrangement with its affiliate Defendant Robinhood Securities, LLC.

7.  Upon information and belief, no members of Defendant Robinhood Financial LLC are citizens of the State of New York.

8.  Defendant Robinhood Securities, LLC is a Delaware limited liability company with its principal place of business at 500 Colonial Center Parkway, Suite 100, Lake Mary, Florida 32746. It is a **wholly-owned subsidiary** of Defendant Robinhood Markets, Inc.; Robinhood Securities, LLC is owned completely by Robinhood Markets, Inc. Defendant

---

[1] According to the Financial Industry Regulatory Authority ("FINRA"), Defendant Robinhood Markets, Inc is the 100% owner of Robinhood Financial LLC *See* https://brokercheck.finra.org/firm/summary/165998#disclosuresSection [Last Accessed February 10, 2021].

Robinhood Securities, LLC is registered as a broker-dealer with the SEC. Defendant Robinhood Securities, LLC acts as a clearing broker and clears trades introduced by its affiliate Defendant Robinhood Financial.

9. Upon information and belief, no members of Robinhood Securities, LLC are citizens of the State of New York.

10. Defendant Robinhood Markets, Inc., **who wholly owns the above-named LLC's,** is a Delaware corporation with its principal place of business at 85 Willow Road, Menlo Park, California 94025. Defendant Robinhood Markets, Inc. is the corporate parent of Defendants Robinhood Financial LLC and Robinhood Securities, LLC.

11. The purposes of diversity jurisdiction, Robinhood Markets, Inc. is a citizen of the State of California or Delaware.

12. Thus, owners and/or members of both Defendants Robinhood Financial LLC and Robinhood Securities, LLC are citizens, for purposes of diversity jurisdiction, of California and/or Delaware.

13. The above-named corporate defendants herein referred to collectively as "Robinhood."

## JURISDICTION AND VENUE

14. This Court has subject-matter jurisdiction over this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), since some of the members of the Proposed Class (defined *infra*) are citizens of a State different from that of the Defendants and, upon the original filing of this Complaint, members of the putative class resided in states around the country; there are more than 100 putative class members; and the amount in controversy exceeds $5 million, exclusive of interest and cost.

15. Pursuant to 28 U.S.C. § 1391, this Court is the proper venue for this action because a substantial part of the events, omissions, and acts giving rise to the claims herein occurred in this District where Robinhood, distributed, marketed, advertised, and sold the trading services which are the subject of the present complaint. Finally, venue is appropriate in this District pursuant to 28 USC § 1391(b)(2) because a substantial part of the acts and omissions that gave rise to this Complaint occurred or emanated from this District.

16. This Court has personal jurisdiction over Robinhood because it is authorized to do business and does conduct business in New York, and because it has specifically marketed, advertised, and made substantial sales in New York, and has sufficient minimum contacts with this state and/or sufficiently avails itself of the markets of this state through its promotion, sales, and marketing within this state to render the exercise of jurisdiction by this Court permissible.

## FACTUAL ALLEGATIONS

### The Robinhood Business Model

17. Robinhood is an online self-directed securities brokerage firm.

18. At the onset, it is important to differentiate between those who use Robinhood's services and those who are Robinhood's customers. The users are the ones that *utilize* the services Robinhood provides, without a fee. The customers are who compensates Robinhood for providing a service. Logically, allegiances will always lie with **customers**, not **users**.

19. Robinhood's revenue stream is not derived from the users ("Users") that use and place trades on its platform and who are aggressively marketed to by Robinhood. Instead, Robinhood generates revenue from third party revenue streams that create monetary benefit based on the deposits, holdings, and actions (and inactions) of Robinhood's users.

20. Practically speaking, Robinhood is no different than social media giants like Facebook, Twitter, Instagram, and TikTok: they provide a free service, and in turn generate revenue by selling their users' data to third parties. As the old saying goes, if you aren't paying for the product, you are the product.

21. Robinhood receives the large majority of its revenue from, amongst other things, a) interest on User deposits, b) interest on loaning User' held stock on the open market, and c) selling User order flow to third parties ("Third Parties")

22. Robinhood's Users place securities trades through the firm's website, by using a web-based application (or "app"). Robinhood permits customers to purchase and sell securities, including futures contracts. Users can place order to purchase ("buy orders") or sell ("sell orders") a security. User can also place orders to purchase options contracts.

23. Robinhood is a commission-registered broker-dealer and a member of Financial Industry Regulatory Authority ("FINRA").

24. Robinhood advertises and promotes its commission-free trading application, and advertises its ability to execute on trades for its Users.

25. Upon signing up for Robinhood, users are encouraged to enable investing on margin which allows users to purchase securities with cash that the user does not have available.

26. Margin is the money borrowed from your brokerage firm in order to purchase an investment. Buying on margin is the act of borrowing money to buy securities. The practice includes buying an asset where the buyer pays only a percentage of the asset's value and borrows the rest from the bank or broker. The broker acts as a lender and the securities in the investor's account act as collateral.  This is one of Robinhood's revenue streams.

27. Margin investing means that the investor does not own the stock that they believe that they own in their account; they have a promise from Robinhood that they own this stock.

28. Additionally, Robinhood lends their Users' stock to Third Parties, and generates revenue through interest on the loan.

29. Robinhood has a vested interested in keeping Third Parties satisfied as these Third Parties include market makers, hedge funds, and large institutional investors who ultimately provide the revenue stream that allows Robinhood to operate.

30. In particular, Third Parties such as "Citadel" are reported to be paying Robinhood a 10x multiple of industry average to purchase order flows from Robinhood, which then shows Citadel the upcoming orders of Robinhood Users.

31. Citadel is one of the world's largest alternative asset managers with more than $35 billion in assets under management as of October 1, 2020.

32. During all times relevant to this civil action, Citadel constituted nearly 50% of Robinhood's order flow volume of revenue/income, making Citadel Robinhood's single largest customer.

**Robinhood's Advertising**

33. Robinhood's advertising campaigns were aggressively marketed toward "outside" investors:

- "**We are all investors**!" Robinhood's advertisement declared, promising the ability to break through the *status quo* of Wall-Street-Suites.

- Robinhood urged its Users to participate in investing in the stock market: "**Robinhood believes** *now* **is the time to do money… so you can start investing today**," one commercial states.

- Robinhood promised its Users a way to financial freedom. ("Investing in financial assets was **the way to financial freedom**.").

- "**A new kind of investor is changing things up**!" another ad declared.

- One commercial introduced viewer to an artist named *Brandon* who used the commissions from his paintings to purchase stocks. Brandon tells the audience that Robinhood has given him his "financial power back" and triumphantly declares "**you are in control of your financial destiny**."

34. Upon information and belief, Robinhood's advertisements ran online throughout this jurisdiction on websites like YouTube, Instagram, and Twitter, on-and-off for the last three years.

35. Robinhood's advertisements consistently advertise a trading platform that was a viable alternative to commission-based competitors, thereby tearing down the walls of seclusion and letting the *outsider* in.

36. Robinhood's advertisement consistently and continuously advertised services that were the same or similar to their competitors.

37. Robinhood's advertisements consistently and continuously, both impliedly and directly, advertised a service in which Users could purchase shares in some of the most popular stocks in the world.

38. Robinhood's advertisements consistently and continuously, both impliedly and directly, advertised a service that was on-par, consistent with, and similar to their competitors.

39. Robinhood has experienced significant growth as a relatively new online brokerage firm. In 2019, Robinhood raised $323 million in funding at a $7.6 billion valuation.

40. The firm claims over 10 million users of its trading app.

41. On or about March 23, 2016, Robinhood's official Twitter account stated: "*Let the people trade.*" They have since disregarded their mantra completely.

### *The GME Short Squeeze and Robinhood's Manipulation of GME Price*

42. At all times material, more than fifty percent (50%) of Robinhood Users held open positions in GME stock.

43. As of around September 19, 2020 Robinhood's order flow customers, including "Melvin Capital" and Citadel held extremely significant short interest in GME that amounted to reportedly more than 120% of the total amount of GME stock outstanding.

44. At that time, Robinhood allowed retail investors to trade GME on their platform including allowing the placing of buy orders, sell orders, and execution of option contracts.

45. As of around November 2020, Melvin Capital, holding significant short interest in GME, had been systemically shorting GME with a desire to drive GME's stock price down over a period of approximately four years.

46. Between around January 1, 2021 and January 28, 2021, due in large part to a public forum aptly named "WallStreetBets" on Reddit, millions of retail investors, the large majority who were likely Users of Robinhood, began placing buy orders intending to drive the value of GME up.

47. Retail investors began circulating their thesis through Reddit on why the value of GME shares might increase in value:

> "…*it's obviously not guaranteed to work out, but it's a reasonable component of the thesis that must be taken into consideration. To quote Sherman: "The industry of gaming is red-hot. The specific issue is the need for GameStop to pivot." GameStop would be in a unique position if they could leverage their position as the sole B&M retailer focused almost exclusively on gaming*."[2]

---

[2] *See*
https://www.reddit.com/r/wallstreetbets/comments/d31bke/gme_yolo_update_following_the_q2_earnings_report/
[Last Accessed January 30, 2021]

48. The GME stock quickly increased in popularity and, therefore, Robinhood's Users began to buy and hold GME stock.

49. On or around January 11, 2021, the price of GameStop Corp. ("GME") stock began to rise significantly.

50. Other stocks began to rise, too, including stocks with the ticker symbol: AMC, BB, BBBY, EXPR, KOSS, NAKD and NOK, among others.[3]

51. These stocks became popular to buy among Robinhood's Users and popular across all trading platforms, including all of Robinhood's competitors who offer similar, if not identical, services.

52. This increased volume through buy orders would in turn require Melvin Capital, who were funded in large part by Citadel, to purchase those securities at significantly higher rates in order to hedge their short positions.

53. The play was simple: Melvin Capital and other holders of short positions in GME stock would be contractually forced to purchase GME shares on the open market from Robinhood Users who held those same shares. As GME's stock price continued to rise, Melvin Capital and Citadel would be required to purchase those stocks at a loss of billions of dollars and, potentially, bankruptcy.

54. On or around January 26, 2021, GME's stock price exploded from approximately $147.98 to approximately $347.51.

55. The significant volume of short interest held by two of Robinhood's biggest customers, Citadel and Melvin Capital, created an incentive for Robinhood to begin cancelling,

---

[3] These listed securities, as well as all other securities Robinhood forbid its customers to buy on January 28, 2021, are hereby referred to as "Blocked Securities."

blocking, and restricting purchases of GME and Blocked Securities (*defined below*) which been shorted by Citadel and Melvin Capital.

56. On or about January 27, 2021, in order to slow the growth of GME and artificially drive down the price, Robinhood took the extraordinary step of unilaterally, and with no explanation, abruptly, purposefully, willfully, and knowingly restricting the Users of their platform from placing buy orders for GME and Blocked Securities, and cancelled recently conducted trades for purchases of these stocks and call options on these stocks.

57. Notably, Robinhood did not halt all trading. Instead, Robinhood only restricted users from placing orders to sell GME and other Blocked Securities.

58. As a result of this action taken by Robinhood, on or about January 27, 2021, the market value for one share of GME plummeted to $193.60 as Users and investors in the general market immediately began selling off their stock for fear the price would plummet even further. **This is simple market fundamentals**: if a security cannot be purchased, it can only be sold. There, the price decreases. With each sudden drop in price, Users lose value while Third Parties gain value.

59. That day, Melvin Capital and Citadel offloaded their short positions in GME and mitigated what would have otherwise been catastrophic losses in the billions of dollars. Even worse, they avoided a potential bankruptcy which would have otherwise resulted in Robinhood losing one of its largest revenue streams.

60. On or about January 28, 2021, in order to further slow the growth and manipulate GME and Blocked Securities, Robinhood limited the amount of the GME and Blocked Securities its Users were able to purchase, meaning, Users could not freely purchase the amount of the GME and Blocked Securities they wished to.  However, Robinhood allowed Users to

sell GME and Blocked Securities and did not restrict or otherwise impede the closing of positions in GME and Blocked Securities.  Robinhood did this in order to benefit Third Parties such as Citadel and Melvin Capital who are market makers and purchasers of Robinhood order flow.

61. By restricting the opening of positions and not restricting the closing of positions, Robinhood effectively manufactured downward pressure on the price of GME and Blocked Securities.

62. This manufactured downward pressure on the trade value of GME and Blocked Securities caused a ripple effect on the trading value of GME and Blocked Securities.  By way of example only, Robinhood Third Parties benefited from Robinhood's action because they were able to see the trades that Robinhood Users had placed in real time. Similarly, while Robinhood Users could not purchase more shares in GME and Blocked Securities, Third Parties were able to exploit this manufactured manipulation to drive the market value of GME and Blocked Securities down significantly. Robinhood Third Parties also took advantage of Robinhood's actions by engaging in a practice known as "Stop-Loss Hunting." As Robinhood had disabled Users' access to open new positions, Third Parties were now free to flood the market (and corresponding order books) with shares in order to drive the price down.

63. The cascading effect meant that any individual, in any brokerage, who placed stop-loss orders designed to protect them against steep drops, had their positions closed due to the downward pressure created by selling without equivalent buying pressure.

64. **Robinhood's unique position in the trading market created an inherent conflict of interest in that it pitted a very large revenue stream, namely MELVIN and**

**CITADEL, who held massive short positions that were betting against GME stock prices and hoping they would go down, against its Users who had in a coordinated fashion bet upon the stock price of GME going up.**  Ultimately, Robinhood failed its Users, and chose its own revenue and that of Third Parties over its duties to its users and the general public.

65. Robinhood **chose** self-preservation of their revenue stream over complying with the law and acting in the best interest of its users.

66. Robinhood also benefitted financially from restricting the purchase of GME and Blocked Securities because Robinhood earned deposit interest on User deposits, because Users were not able to purchase GME and Blocked Securities with their deposits.  Thus, Robinhood unjustly benefitted from deposit interests because it did not allow its Users to use their deposits to purchase GME and Blocked Securities.

67. Robinhood also benefitted financially from restricting the purchase of GME and Blocked Securities because Robinhood continued to sell its user data to Third Parties who were the beneficiaries of the reduction in the price of GME and Blocked Securities due to Robinhood's actions.  Upon information and belief, Robinhood's actions were done purposefully and knowingly to manipulate the market for the benefit of Melvin Capital and Citadel, who were not Plaintiffs, the Classes, or other retail investors.

68. As a result of Robinhood's actions, countless investors who owned GME and Blocked Securities had purchased them through other platforms had large financial losses as a result of either selling off their interests in GME and Blocked Securities or holding the interests but at a lower price due to Robinhood's actions.  Moreover, countless investors intended to purchase GME and Blocked Securities and were force not to do so because of the

massive decreases in prices that were caused by Robinhood's market manipulation. This has led to a substantial economic loss from all persons who owned GME and Blocked Securities or planned on buying the GME and Blocked Securities, such as the plaintiffs in this matter.

69. In early January, 2021, Robinhood allowed their Users to purchase shares of GME as well as the other Blocked Securities.

70. At that time, in or around early and mid-January of 2021, Robinhood made no indication to their Users that they would be restricting their users from purchasing shares in GME, AMC, BB, BBBY, or any other Blocked Securities. At the time, the Blocked Securities were trading at increasing volumes compared to their volume before their rise in popularity.

71. In or around early and mid-January, GME and some of the Blocked Securities were the most popular stocks in the world, rivaling the purchases of stocks in Apple, Facebook, and Tesla.

72. Robinhood gave no reasonable warning before restricting its Users from purchasing what, at that time, were some of the most popular securities in the world.

73. Robinhood failed to give any indication to their Users that they would arbitrarily restrict purchasing some of the most popular stocks in the world.

74. Robinhood's arbitrary and discretionary decision to restrict purchasing of the Blocked Securities was a breach of their fiduciary duties to their Users.

75. Robinhood's discretionary decision and breach of fiduciary duty impacted Users who had already purchased GME and other Blocked Securities.

76. For instance, on January 28, 2021, GME's per share value dropped from $486 to $153.00 a share.

77. At all times material, Robinhood knew or should have known their unwarranted, discretionary decision to restrict purchases of GME and the Blocked Securities would materially impact their Users' investment positions.

78. Implicit in every offer for service Robinhood had ever made, was that Users would be able to trade the world's most popular stocks, and be able to purchase the world's most popular stock, especially during unprecedented gains—such as with GME, AMC, and other Blocked Securities.

79. Despite advertising its ability to allow users to buy popular stocks, Robinhood failed to deliver on their promises. This failure was for no legitimate reason.

80. Upon information and belief, Robinhood's actions were done purposefully and knowingly to manipulate the market for the benefit of individuals and financial intuitions who were not Robinhood's Users.[4]

81. Robinhood clients, prior to January 28, 2021, were not alerted about any potential conflicts of interested Robinhood may have.

82. Since restricting the purchase of the stock from their app, GME prices have gone up, depriving investors of potential gains and creating a disadvantage for investors who used the Robinhood app.

---

[4] "All roads in last week's saga seemed to go through Citadel. The market maker, Citadel Securities, is one of the biggest sources of Robinhood's revenue, as it pays the no-fee trading app for handling its orders and fills more of them than any other firm. Meanwhile, [Citadel] invested $2 billion in Melvin Capital, which lost 53% in January after being bloodied by a short squeeze on shares including GameStop. Citadel's hedge funds lost less than 1% from its investment in Melvin, and overall dropped 3% during the month."
[https://www.bloomberg.com/news/articles/2021-01-31/the-citadel-link-what-ken-griffin-has-to-do-with-gamestop]
[Last Accessed February 2, 2021].

83. No reasonable Users would anticipate Robinhood to, abruptly and without warning, forbid them from purchasing one of the world's most popular stocks that was on a historic rise.

84. No Users were warned of such unfair practices by Robinhood.

85. Because of Robinhood's failure to warn, Users did not have the opportunity to transfer money from their Robinhood accounts to another brokerage account. Thus, Users lost out of the days opportunity to purchase GME and the Blocked Securities.

86. On or about January 27, 2021, other major trading platforms, such as E*Trade, continued to allow their customers to purchase GME and the Blocked Securities that Robinhood had removed.

87. Thus, Robinhood's abrupt removal of the world's most popular stocks did not conform with industry standards and was completely unexpected.

88. Robinhood's abrupt removal of some of the world's most popular stocks contradicted every advertising campaign Robinhood had ever ran.

89. Robinhood has completely restricted retail investors from purchasing GME and other stocks for no legitimate reason, thereby depriving retailer investors from the benefits of Robinhood's services.

90. The Financial Industry Regulatory Authority ("FINRA"), which governs brokers like Robinhood, espouses rule 5310 regarding "Best Execution and Interpositioning." Rule 5310.01 requires that Robinhood "*must make every effort to execute a marketable customer order that it receives promptly and fully.*" By failing to respond at all to Users' placing timely trades—and outright blocking customers from trading a security— Robinhood has breached these, among other, obligations and caused its customers

substantial losses due solely to its own negligence and failure to maintain adequate infrastructure.

91. Or, alternatively, Robinhood has solicited Users for a service they cannot provide in an adequate manner with proper safeguards, or up to industry standards and, these shortcomings, have harmed their customers.

92. Or, alternatively, Robinhood was negligent in how they operated. Robinhood knew they had a duty of care with respect to their Users, but completely disregarded that duty by making the discretionary decision to restrict placing of buy orders on GME and the Blocked Securities.

93. Or, alternatively, Robinhood was negligent because they knew or should have known, through the use of industry standard risk management and compliance, that allowing their Users to continue to place buy orders using their service would require additional working capital and should have made arrangements for same in order to maintain trading. At the very least, Robinhood should have informed their Users of the likelihood that Robinhood would not be able to meet its capital requirements to allow its Users sufficient time to withdraw their funds to a different, more capable, brokerage.

94. Or, alternatively, Robinhood was negligent because they knew or should have known their need to raise adequate margin liquidity for the types and volume of trades that they offered to users of their platform leading up to and through the events giving rise to this lawsuit. This is evidenced by the fact that in or around March of 2020, Robinhood raised capital in order to maintain sufficient margin liquidity for the types of trades they offer to their Users.

95. On January 29, 2021, after massive political and social backlash Robinhood *somehow* managed to partially restore Users the ability for Users to place buy orders for GME and Blocked Securities.

96. However, Robinhood did not remove all restrictions on Blocked Securities. Instead, they applied arbitrary and irrelevant restrictions to the purchase of Blocked Securities based on the number of shares then-owned by the Users. For example, if a User owned more than one (1) share of GME, the User was restricted from purchasing additional shares. In this way, Robinhood artificially manipulated the market demand for GME and other Blocked Securities. The position held in a certain stock has no measurable impact on Robinhood's ability to accept a buy order and process a purchase for the same security.

97. Robinhood knew, or should have known the affect their actions would have on the stock market and the stocks owned by retail investors and persons such as Plaintiffs and Class Members.

98. The only parties who could reasonably expect significant benefit from Robinhood's restrictions on Blocked Securities imposed around January 27, 2021 are the hedge funds shorting Blocked Securities. These hedge funds are Robinhood's Customers, such as Melvin Capital and Citadel.

99. Robinhood's restriction on purchase-side trading activity by its users on around January 27, 2021, allowed a period of approximately twenty-four hours for its largest Customers, including Melvin Capital and Citadel, to reposition and attempt to save themselves due to their massively under-equitized short interest in GME and the Blocked Securities

100. In short, Robinhood chose to take actions that would benefit Third Parties and customers at the expense of their Users.

101. Since Robinhood's negligence, breach of fiduciary obligations, failure to warn their clients, failure to operate within industry standards, and other bad acts, Robinhood's CEO has attended numerous interviews.

102. Some interviews outline a different variation on Robinhood's justification for *why* Robinhood restricted the purchase of Blocked Securities.

### Plaintiffs' Experience

103. On the morning on January 28, 2021, Plaintiffs used their Robinhood app, searched for GME and the Blocked Securities on Robinhood's app, and found they were unavailable for purchase.

104. Upon searching for the security in the Robinhood app's search tool, GME and other Blocked Securities did not appear.

105. GME and the other Blocked Securities are publicly traded companies that were at the time available on other platforms.

106. After eventually finding GME and other Blocked Securities on Robinhood's app, Plaintiffs found they were unable to submit orders to purchase GME and the other Blocked Securities with cash in their accounts.

107. Thus, Plaintiffs, like so many others, lost out on all earning opportunities because of Robinhood's negligence, breach of fiduciary duties, failure to act in good faith, and complete failure to warn or disclose relevant information.

108. Additionally, Plaintiffs found the value of stocks they did own in the Blocked Securities, plummeted, costing them, both individually and collectively, millions of dollars in unrealized gains and losses. This occurred because Robinhood artificially suppressed buy pressure on these securities.

109. Plaintiffs, like so many others, reasonably believed Robinhood would allow them to purchase the world's most popular securities, especially at a time when those securities were performing so well.

110. Plaintiffs never knew, nor were they ever warned, that Robinhood would restrict purchases of GME and the Blocked Securities.

111. Plaintiffs never knew, nor was they warned, that Robinhood had many conflicts of interest due to their business model and outside investors..

112. Plaintiffs reasonable believed that Robinhood operated similar to any other trading platform competitor, as advertised.

## CLASS ACITON ALLEGATIONS

113. Plaintiff brings claims pursuant to Federal Rule of Civil Procedure 23 on behalf of the following Class, as defined below:

**All Robinhood customers and/or Users within the United States.**

114. Additionally, or in the alternative, Plaintiff brings claims pursuant to Federal Rule of Civil Procedure 23 on behalf of the following Subclass, as defined below:

**All Robinhood customers within the United States who were not able to submit purchase orders for GME and the Blocked Securities after Robinhood knowingly, willfully, and purposefully removed them completely and/or restricted them from their platform; all customers within the United States who were harmed by Robinhood's knowingly, willfully, and purposeful removal of GME and the Blocked Securities.**

115. Additionally, or in the alternative, Plaintiff brings claims pursuant to Federal Rule of Civil Procedure 23 on behalf of the following Subclass, as defined below:

**All Robinhood customers within New York State.**

116. Additionally, or in the alternative, Plaintiff brings claims pursuant to Federal Rule of Civil Procedure 23 on behalf of the following Subclass, as defined below:

**All Robinhood customers within New York State who were not able to execute trades on GME and the Blocked Securities after Robinhood knowingly, willfully, and purposefully removed them completely and/or restricted them from their platform; all customers within New York State who were harmed by Robinhood's knowingly, willfully, and purposeful removal of GME and the Blocked Securities.**

117. Excluded from the Class are the Robinhood entities and their current employees, counsel for either party, persons who would cause diversity jurisdiction to fail, as well as the Court and its personnel presiding over this action.

118. This action has been brought and may properly be maintained as a class action against Robinhood pursuant to the provisions of Federal Rule of Civil Procedure 23.

119. **Numerosity:** The precise number of members of the proposed Class is unknown to Plaintiff at this time, but, based on information and belief, Class members are so numerous that their individual joinder herein is impracticable. Based on information and belief and publicly available reports, Class members number in the hundreds of thousands and up to ten million. Subclass members are likely in the thousands. All Class and Subclass members may be notified of the pendency of this action by reference to Robinhood's records, or by other alternative means.

120. **Commonality**: Numerous questions of law or fact are common to the claims of Plaintiff and members of the proposed Class. These common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class

members. These common legal and factual questions include, but are not limited to the following:

a.  Whether Robinhood knowingly failed to provide the financial services that were needed to handle reasonable consumer demand, including trading securities that are available on every other competitive trading platform;

b.  Whether Robinhood failed to provide the duty of care to their customers when they purposefully removed GME;

c.  Whether Robinhood removed GME purposefully to harm their customers' positions in GME and benefit their own potential financial gains;

d.  Whether Robinhood violated FINRA Rule 5310, among other FINRA rules, state rules, and federal regulations;

e.  Whether Robinhood violated consumer protection laws in failing to disclose that its services would not include the ability to trade on GME, and other securities, for substantial periods of time;

f.  Whether Robinhood was in breach of its legal, regulatory, and licensing requirements by failing to provide adequate access to financial services;

g.  Whether Robinhood was in breach of its contracts and/or the implied covenant of good faith and fair dealing in connection with its failure to provide financial services;

h.  Whether Robinhood was negligent or grossly negligent by failing to provide financial services in a timely manner due to its own possible nefarious desires;

i.  Whether Robinhood breached its fiduciary duties to customers by failing to provide adequate access to financial services;

j.  Whether Robinhood was unjustly enriched by its conduct;

k.  Whether Plaintiff and the other Class members were injured by Robinhood's conduct, and if so, the appropriate class-wide measure of damages, restitution, and other appropriate relief, including injunctive relief.

l.  Whether Plaintiff and the other Class members are entitled to injunctive and declaratory relief.

121. **Typicality:** The claims of the named Plaintiff are typical of the claims of the proposed Class in that the named Plaintiff was a customer during the class period and was unable to trade GME and place time-sensitive trades on GME and sustained damages as a result of Robinhood's wrongful conduct.

122. **Adequate Representation:** Plaintiff will fairly and adequately represent the interests of the Class in that he has no conflicts with any other Class members. Plaintiff has retained competent counsel experienced in prosecuting complex class actions, including those involving financial services, and they will vigorously litigate this class action.

123. **Predominance and Superiority**: There is no plain, speedy, or adequate remedy other than by maintenance of this class action. A class action is superior to other available means, if any, for the fair and efficient adjudication of this controversy. Prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for the Defendant. Additionally, given the relatively modest damages sustained by most individual Class members, few, if any, proposed Class members could or would sustain the economic burden of pursuing individual remedies for Robinhood's wrongful conduct. Treatment as a class action will achieve substantial economies of time, effort, and expense, and provide

comprehensive and uniform supervision by a single court. This class action presents no material difficulties in management.

124. Class action certification is warranted under Fed. R. Civ P. 23(b)(1)(A) because the prosecution of separate actions by individual members of the proposed Class would create a risk of inconsistent or varying adjudications with respect to individual Class members, which may produce incompatible standards of conduct for Defendants. 34. Class action certification is warranted under Fed. R. Civ P. 23(b)(1)(B) because the prosecution of separate actions by individual members of the proposed Class would create a risk of adjudications with respect to individual Class members which may, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

125. The prerequisites to maintaining a class action for injunctive or equitable relief pursuant to Fed. R. Civ. P. 23(b)(2) are met as Robinhood has acted or refused to act on grounds generally applicable to the Class, thereby making final injunctive, declaratory, or equitable relief appropriate with respect to the Class as a whole. 36. Class action certification is also warranted under Fed. R. Civ P. 23(b)(3) because questions of law or fact common to the Class members predominate over any questions affecting only individual members, and a Class action is superior to other available remedies for the fair and efficient adjudication of this controversy. The amount of damages available to the individual Plaintiff is insufficient to make litigation addressing Robinhood's conduct economically feasible for most in the absence of the class action procedure. Individualized litigation also presents a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system

presented by the legal and factual issues of the case. By contrast, the class action device

presents far fewer management difficulties and provides the benefits of a single

adjudication, economy of scale, and comprehensive supervision by a single court.

126.  Class action certification is also warranted under Fed. R. Civ P. 23(c)(4) because

questions of law or fact common to the Class members may be certified and decided by

this Court on a class wide basis.

## CAUSE OF ACTION I
## For Breach of Contract

127.  Plaintiffs hereby incorporate by reference the factual allegations set forth

above.

128.  In order to use the Robinhood trading platform, a potential customer must enter into the

Customer Agreement with Robinhood.

129.  Plaintiff and all class members did enter into a Customer Agreement with Robinhood.

130.  Robinhood breached its Customer Agreement by, among other things, failing to disclose

that its platform was going to randomly pull a profitable stock from its platform; that

Robinhood failed to provide adequate explanation to their customers; that Robinhood

knowingly put their customers at a disadvantage compared to customers who used other

trading apps; that Robinhood failed to provide access to its own financial incentives to

pull certain securities including GME; that Robinhood's prohibited plaintiffs from

performing in a timely manner (or at all) under the contract; that Robinhood failed to

comply with all applicable legal, regulatory, and licensing requirements; and that

Robinhood failed to exercise trades and actions requested by customers.

131.  As such, Robinhood breached its Customer Agreement with Plaintiff and Class members.

132. Robinhood's failure to perform and its breaches of the Customer Agreement resulted in damages and losses to Plaintiff and Class members and continues to expose them to harm because Robinhood continues to fail to perform under the Customer Agreement. These losses reflect damages to Plaintiff and Class members in an amount to be determined at trial or separate proceedings as necessary.

## CAUSE OF ACTION II
## Breach of the Implied Covenant of Good Faith and Fair Dealing

133. Plaintiffs hereby incorporate by reference the factual allegations set forth above.

134. Plaintiffs and members of the Class and Subclass entered into the Customer Agreement with Defendant Robinhood to open a Robinhood trading account. They agreed to Robinhood's Terms and Conditions by using Robinhood's website and trading platform.

135. Plaintiffs and members of the Class and Subclass fulfilled their obligations under these contracts by adhering to their terms and using Robinhood's trading services through its website and trading platform.

136. Robinhood was obligated to provide the trading services required under those contracts at all times, including but not limited to, trades for GME, AMC, BB, BBBY, among other securities plaintiffs could not purchase on January 28, 2021.

137. When initially signing up for Robinhood, Plaintiff and all those similarly situated could and most actually did trade GME, AMC, BB, BBBY, among other securities plaintiffs could not purchase on January 28, 2021.

138. When initially signing up for Robinhood, Robinhood had never forbidden costumers from training one of the most popular and frequently traded stocks in the world (including stocks in Apple, Microsoft, and Tesla).

139. Within the online brokerage firm industry, no other platforms ever forbid the purchasing of (i) one of the worlds most frequently traded stocks; (ii) when the price of that stock is generally ascending.

140. Robinhood unfairly interfered with the rights of Plaintiffs and members of the Class and Subclass to receive the benefits of the Customer Agreement by, among other things, (i) failing to provide services necessary to carry out a trade; (ii) failing to provide certain trading services whatsoever; (iii) failing to inform individuals in a timely member of the drastic changes in trading abilities; (iv) prohibiting plaintiffs from buying GME and other securities for Robinhood's own pecuniary interest and not disclosing those interest to Plaintiffs and all Class and Subclass members; (v) not providing services up to industry standards; (vi) failing to maintain the ability, technology, support, liquidity, knowledge, or resources to provide customers what had been promised, offered, and/or expected; (vii) allowing customers to trade on popular securities.

141. Robinhood has no legitimate reason for its conduct and could only be seen to have acted in bad-faith.

142. Robinhood's conduct has caused Plaintiffs and members of the Class and Subclass harm, losses, and damages. These losses reflect damages to Plaintiffs and members of the Class and Subclass in an amount to be determined at trial or separate proceedings as necessary.

## CAUSE OF ACTION III
### Negligence

143. Plaintiffs hereby incorporate by reference the factual allegations set forth above. Robinhood had a duty to exercise reasonable care in conducting and facilitating transactions for its customers.

144.   Robinhood had a duty to exercise reasonable care in providing trades on the free, open market for its customers.

145.   Robinhood unlawfully breached its duties by, among other things, (i) removing GME and other securities without notice from its trading app; (ii) failing to provide financial services related to GME and other popular securities; (iii) failing to notify customers in a timely manner of the GME "blackout"; (iv) failing to maintain the ability, technology, support, liquidity, knowledge, or resources to provide customers what had been promised, offered, and/or expected.

146.   Robinhood's conduct as set forth in this Complaint was want of even scant care, and its acts and omissions were and continue to be an extreme departure from the ordinary standard of conduct, particularly in light of their competitors' actions and industry standards. Their actions breach any duty of care to their customers, but are also inconsistent with the standard of care expected from similar firms in the open market.

147.   Upon information and belief, no institutions similar to Robinhood has ever outright banned customers from purchasing a specific share of a specific security while the price was ascending.

148.   Robinhood essentially abandoned its customers altogether by pulling GME and other of the world's most popular stocks, a standard of care so far below what is required for a business engaging in time sensitive trading services that it amounts to a complete abandonment of its duties.

149.   Robinhood took these actions knowing that many customers could not pull their money out of their app, transfer their money to or open another online trading account, and make the necessary purchases in time to secure prices of certain securities.

150. Robinhood's grossly negligent and wrongful breaches of its duties owed to Plaintiffs and members of the Class and Subclass proximately caused losses and damages that would not have occurred but for Robinhood's gross breach of its duty of due care. These losses reflect damages to Plaintiffs and members of the Class and Subclass in an amount to be determined at trial or separate proceedings as necessary.

## CAUSE OF ACTION IV
### Breach of Fiduciary Duty

151. Plaintiff hereby incorporates by reference the factual allegations contained herein.

152. As a licensed provider of financial services, Robinhood at all times relevant herein was a fiduciary to Plaintiff and Class members and owed them the highest good faith and integrity in performing its financial services on their behalf. Robinhood also acted as a fiduciary to each and every customer who agreed to the Customer Agreement.

153. Robinhood breached its fiduciary duties to Plaintiff and Class members by, among other things, failing to disclose that its platform was going to remove GME and other stock purchases in a timely manner; actually removing GME and other stocks; removing GME and other stocks for its own pecuniary benefits or prospective pecuniary benefits; that Robinhood failed to provide access to its financial services in a timely manner; that Robinhood failed to comply with all applicable legal, regulatory, and licensing requirements; and that Robinhood failed to exercise trades and actions requested by customers in a complete and timely manner (also required by FINRA Rule 5310).

154. Robinhood's conduct has caused Plaintiff and Class members' harm, losses, and damages and continues to expose them to harm because Robinhood continues to breach its fiduciary duties. These losses reflect damages to Plaintiff and Class members in an amount to be determined at trial or separate proceedings as necessary.

**CAUSE OF ACTION V**
**DECEPTIVE BUSINESS PRACTICE**
**NYC Code § 20-700**

155. Plaintiff hereby incorporates by reference the factual allegations contained herein.

156. NYC Code § 20-700 prohibits deceptive trade practices, and bars "any deceptive or unconscionable trade practice in the sale … of any consumer goods or services[.]" NYC Code § 20-700.

157. Deceptive practices include, but are not limited to: "(1) representations that goods or services have sponsorship, approval, accessories, characteristics, ingredients, uses, benefits, or quantities that they do not have; the supplier has a sponsorship, approval, status, affiliation, or connection that he or she does not have;[…](2) the use, in any oral or written representation, of exaggeration, innuendo or ambiguity as to a material fact or failure to state a material fact if such use deceives or tends to deceive; […] (4) offering goods or services with intent not to sell them as offered; (5) offering goods or services with intent not to supply reasonable expectable public demand, unless the offer discloses to limitation of quantity…"

158. Defendants led reasonable consumers to believe they had the ability to purchase publicly traded stocks on their platform when they did not.

159. Defendants violated NYC Code § 20-701 repeatedly by, among other acts, offering consumer services, making representation as to (i) Defendants' abilities to allow their customers to use their service; (ii) Defendants' abilities to timely execute their service; (iii) Defendants' making repeated representations as to regular, industry use of Defendants' service; (iv) Defendants' failing to forewarn its customers that is service

would be unavailable or not as advertised or not usable in accordance with industry standards.

160. As a result of Defendants deceptive business practices plaintiff and the Class Members suffered significant damages.

**CAUSE OF ACTION VI**
**DECEPTIVE ACTS AND PRACTICES**
**N.Y. Gen. Bus. Law § 349**

161. Plaintiff hereby incorporates by reference the factual allegations contained herein.

162. Deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful. N.Y. Gen. Bus. Law § 349

163. Defendants made multiple representations or omissions relating to their service, their ability to provide their advertised service, the ability to perform their offered services up to industry standards, and their ability to warn consumers of their pitfalls.

164. As a consumer of Defendants' services, Plaintiffs are authorized to bring a private action under New York's Uniform Deceptive Trade Practices Act, Gen. Bus. Law § 349(h) ("GBL § 349(h)").

165. Plaintiff and the Class Members of plaintiff are a "person" within the meaning of GBL § 349.

166. A reasonable consumer, using Defendants' service, would reasonably believe that they would be able to purchase the Blocked Securities.

167. Defendants made numerous representations to plaintiffs and the Class Members that were misleading.

168. Defendants failed to provide plaintiff and the Class Members necessary information or warnings relating to their services to plaintiff and the Class Members.

169. It is materially misleading to refuse to let

170. The GBL prohibits "deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state." GBL § 349(a).

171. This Count is brought for Defendants' deceptive conduct, including their unlawful and deceptive acts related to the breach alleged herein. For example:

- The above unfair and deceptive acts and practices by Defendants were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury to consumers that the consumers could not reasonably avoid. This substantial injury outweighed any benefits to consumers or to competition.

- Defendants knew or should have known that their computer systems and data security practices were inadequate to safeguard Plaintiff's and Class Members' e-PHI and that risk of a data breach or theft was highly likely. Defendants' actions in engaging in the abovenamed deceptive acts and practices were negligent, knowing and reckless with respect to the rights of members of the Class.

- Plaintiff and Class Members relied on Defendants' deceptive acts and practices when they paid money in exchange for goods and services and provided their e-PHI to Northeast Radiology for medical treatment.

- Plaintiff and Class Members relied on Defendants to safeguard and protect their e-PHI and to timely and accurately notify them if their data had been accessed

by unauthorized third parties. - Plaintiff and Class Members seek all available relief under the New York GBL § 349 et seq.

172. As a result of Defendants deceptive business practices plaintiff and the Class Members suffered significant damages.

## CAUSE OF ACTION VII
## DECEPTIVE ACTS AND PRACTICES
## N.Y. Gen. Bus. Law § 350

173. Plaintiff hereby incorporates by reference the factual allegations contained herein.

174. The acts of Defendants, as described above, and each of them, constitute unlawful, deceptive and fraudulent business acts and practices.

175. New York General Business § 350 provides: False advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state is hereby declared unlawful.

176. Robinhood engaged in false advertising as defined by § 350-a, among other bad acts, failing to tell Customers they would be forbidden from purchasing many of the world's most popular, frequently traded stocks in the event those stocks go up. Or, alternatively, Robinhood failed to disclose to their clients they could not provide, handle, or were ill-equipped to allow their customers to buy popular securities.

177. As a result of Defendants' deceptive practices, Plaintiffs suffered damages.

## CAUSE OF ACTION VIII
## Unjust Enrichment

178. Plaintiff hereby incorporates by reference the factual allegations contained herein.

179. Robinhood was unjustly enriched at the unknowing expense of their Users.

180. As a result of Defendants' deceptive practices, Plaintiffs suffered damages.

**RELIEF REQUEST:**

1. Enter an award for plaintiffs to be determined;

2. Enter an award for attorneys fees and costs;

3. Enter an award for punitive damages for the willful, wanton, and reckless behavior of

   Defendants;

4. Any other relief this Court deems just and fit.

Date: February 24, 2021

                        **Respectfully,**

                        **DEREK SMITH LAW GROUP, PLLC**


                        _____
                        Alexander G. Cabeceiras, Esq.
                        One Penn Plaza, Suite 4905
                        New York, New York 10119